FILED
2011 Sep-29  PM 12:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| SHERRI M. EAGERTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV-10-BE-1948-NW |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| Administration | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION

## I. INTRODUCTION

On May 17, 2007, the claimant, Sherri Eagerton applied for a period of disability and disability insurance benefits under Title II of the Social Security Act. (R. 78). The claimant alleges disability commencing on December 1, 2007[1] because of arthritis, depression and nausea. (R. 38-39). The Commissioner denied the claim on July, 18, 2007. (R. 63). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on October 7, 2008. (R. 34). In a decision dated November 20, 2008, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and, thus, was ineligible for social security disability insurance. (R. 8). On June 23, 2010, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted her

---

[1]The claimant initially alleged disability as of April 23, 2007, but subsequently amended her alleged onset date to December 1, 2007 on October 7, 2008 (R. 38).

1

administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. § § 405(g) and

1283(c)(3).  For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUE PRESENTED

The claimant presents the following issue for review: whether the Appeals Counsel

properly considered the additional medical evidence submitted subsequent to the ALJ hearing.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must

affirm the Commissioner's decision if the Commissioner applied the correct legal standards and

if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham*

*v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.

1987).

"No... presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999. The Commissioner's factual determinations, however, are not reviewed *de novo*, but

are affirmed if supported by substantial evidence. "Substantial evidence" is "more than a mere

scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Richardson v. Perales*, 401 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look

only to those parts of the record that support the decision of the ALJ, but also must view the

record in its entirety and take account of evidence that detracts from the evidence relied on by the

ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person cannot "engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential

evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability. A negative answer
> to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

The Appeals Council will review a case if the claimant submits new and material

evidence. 20 C.F.R. § 404.790(b). "New" evidence is evidence that is non-cumulative and

"material" evidence is evidence that is "relevant and probative so that there is a reasonable

possibility that it would change the administrative result." *Milano v. Bowen*, 809 F. 2d 763, 766

(11th Cir. 1987).

## V. FACTS

The claimant has a high school education and was forty-five years old at the time of the

administrative hearing. (R. 11, 36).  Her past work experience includes employment as a

housekeeper, tagging machine operator, sander, and production assembler.  (R. 51-52).  Claimant

alleges that she has been unable to work since December 1, 2007 because of arthritis, depression

and nausea. (R. 38-39).  She has not engaged in substantial gainful activity since the alleged

onset date. (R. 11).

*Medical History*

The claimant has a history of arthritis.  On February 20, 2004, claimant visited Eliza

Coffee Memorial Hospital (ECMH) and complained of left shoulder pain.  A total body scan

revealed no abnormal areas of increased uptake of activity or shoulder activity.  On April 14,

2004, the claimant visited ECMH emergency room and complained of swelling all over her body

and pain in her joints.   The nurse noted swelling in the claimant's left wrist and hand.   A

diagnostic report revealed that skeletal and soft tissue elements were within normal limits and

found no evidence of a fracture or arthritic changes.  On April 15, 2005, the claimant visited

ECMH for a follow-up total body bone scan, and the results of the scan were normal. (R. 176-

190).

Between July 30, 2004 and May 7, 2007, Dr. Hames, a podiatrist, treated the claimant

twenty-two times for chronic foot pain.  A foot x-ray revealed cortical thickening of the

metatarsal rays, talo-navicular fault, and a heel spur on her left foot.  Dr. Hames's assessments

noted that the claimant had pain in her limb, an infection, hypermobile first ray, flat feet, plantar

fasciitis (heel spur), tenosynovitis (inflammation of the sheath around the tendon), bilateral,

posterior tibial tendonitis, peroneal brevis tendonitis, peroneal longus tendinitis, metatarsalgia

(pain in the forefoot), ankle instability,  and heel spur syndrome on her left foot.  Under Dr. Hames's care, the claimant's left foot was injected with steroids; she received prescriptions for Vioxx (anti-inflammatory drug), Lortab (pain reliever), Medrol Doespak (anti-inflammatory drug), Gris-Peg (infection treatment), Naprosyn (anti-inflammatory drug), Celebrex (arthritic symptoms treatment), Liderderm Patch (pain reliever) , Lamisil, Ultram (pain reliever), Tramodol (pain reliever), and Bextra (anti-inflammatory drug); and received instructions regarding stretching exercises. During the period the claimant was under his care, Dr. Hames prescribed for her a cam walker, an unna boot (gauze bandage used in treating various venous insufficiencies), an air heel, an over-the-counter ankle foot orthotic, and a custom-made ankle foot orthotic. (R. 275-302).

On September 3, 2004, Dr. Hames performed on the claimant a heel spur resection with endoscopic plantar fasciotomy surgery. (R. 142).  On May 7, 2007, Dr. Hames reported that despite surgery, orthosis, prosthetics, anti-inflammatory medication and opoids, the claimant's pain was persistent.  Dr. Hames noted that no additional surgery was advisable and that the claimant experienced difficulty with performing daily activities, including standing, bending, kneeling, and walking.  Dr. Hames recommended pain management.  He also noted the claimant's "need for disability secondary to chronic foot and back pain."  (R. 277).

The claimant also has a history of nausea and anxiety.  On September 24, 2004, claimant complained of nausea lasting four days, and recurrent abdominal pain.  Claimant was treated at ECMH for atypical paroxysmal abdominal pain of uncertain etiology.  The exam and tests reflected no evidence of obstruction or infection.  Claimant improved on Protonix and Benyl and

was released from the hospital.

Claimant returned to the hospital and complained of shortness of breath and anxiety to Dr. Hobbs, an internal medicine practitioner.  Claimant mentioned that in the past she took Lexapro (antidepressant) and Effexor (antidepressant).  Dr. Hobbs noted that the claimant had anxiety with panic and worry that likely contributed to her recent gastric intestinal (GI) episode. Dr. Hobbs prescribed Effexor in an increasing dose and Klonopin (panic disorder treatment) temporarily.  On September 27, 2004, claimant returned for a followup visit and reported feeling well.  Claimant reported no nausea, abdominal pain or vomiting.  (R. 147-148; 264-266).

On October 4, 2004, claimant complained to Dr. Hobbs of recurrent vomiting.  Dr. Hobbs determined that the recurrent vomiting was probably caused by claimant's anxiety and panic variant.  Dr. Hobbs prescribed for claimant Phenegran suppositories (motion sickness treatment) and restarted her on Klonopin.  On October 24, 2004, Claimant complained of anxiousness, nausea and abdominal pain.  Dr. Hobbs increased claimant's dosage of Effexor.  On October 25, 2004, claimant complained of recurrent paroxysms of nausea followed by dull epigastric pain and diarrhea.  Dr. Hobbs determined that claimant had chronic atypical abdominal symptoms in the face of anxiety and stress. (R. 261-263).

On November 30, 2004, claimant reported moderate improvement and one episode of nausea in the previous week.  On January 25, 2005, claimant complained of nausea in the mornings but neither abdominal pain nor vomiting.  On January 26, 2005, Dr. Hobbs temporarily increased claimant's Klonopin dosage. (R. 254-258).

On February 21, 2005, claimant complained to Dr. Hobbs of nausea and right

paraepigastric pain.  Dr. Hobbs noted a connection between the claimant's anxiety and nausea with her periods and changed her Effexor prescription to Paxil (anxiety and panic attack treatment).  On March 16, 2005, claimant complained of persistent morning nausea and intermittent dry heaves, but no abdominal pain.  Dr. Hobbs determined claimant suffered from anxiety and depression.  On April 15, 2005, claimant reported an overall improvement.  Claimant also reported that she was emotionally better but not 100%.  Dr. Hobbs increased claimant's Paxil dosage.  On May 16, 2005, claimant had a follow up appointment with Dr. Hobbs, indicating that she was generally feeling well and that nausea, abdominal pain, and diarrhea were infrequent.  (R. 249-253).

On May 20, 2005, Dr. Amanda Mumford, a psychiatrist with Alabama Psychiatric Services, PC in Florence, Alabama, performed an evaluation on claimant.  Dr. Mumford determined that over the previous months claimant's anxiety and depression had increased.  Dr. Mumford also noted that the claimant had a partial response to Paxil and increased her dosage.  Claimant's diagnoses were major depressive disorder and a GAF score of 60.  (R. 308-328).

On June 27, 2005, claimant underwent a total hysterectomy.  The medical record reflected evidence of endometriosis.  (R. 152).  On July 21, 2005, claimant complained of nausea, sleepiness, and depression.  Dr. Hobbs determined that a hormone imbalance caused by the hysterectomy aggravated her symptoms.  Dr. Hobbs also noted that claimant's nausea was historically functional.  Dr. Hobbs increased claimant's Paxil dosage on July 22, 2005.  (R. 245-247).

On August 12, 2005, claimant reported to Dr. Hobbs feeling better but still experiencing morning nausea.  On September 16, 2005, claimant complained of an increase in

nausea and abdominal pain.  Dr. Hobbs noted claimant had gained four pounds in the last month.

On December 15, 2005, claimant complained of a two-day tension headache but said her

headaches were generally infrequent.  (R.240-244).

On January 20, 2006, claimant complained of feeling tired in the morning and dizziness

with range of motion of the head, but without lightheadedness or orthostatic symptoms.  Dr.

Hobbs determined that the claimant had viral labyrinthine (inflammation of a structure of the ear)

quality dizziness.  On February 9, 2006, claimant complained of cough, rhinorrhea (watery

mucus discharge of the nose), and nasal congestion.  Dr. Hobbs prescribed claimant Sudafed and

Flonase.  On February 13, 2006, claimant reported improvement but requested antibiotics.  On

February 20, 2006, claimant complained of cramps and diarrhea and Dr. Hobbs recommended a

clear liquid diet and Imodium AD.  On March 2, 2006, claimant complained of sore throat with

drainage and Dr. Hobbs prescribed her an antibiotic.  On March 3, 2006, Dr. Hobbs prescribed

claimant Nasonex.  On April 5, 2006, complained of rhinorrhea (watery mucus discharge), sore

throat and sensation of tongue swelling.  Dr. Hobbs determined claimant had allergic rhinitis

(stuffy nose) and noted that no evidence of an infection existed.  (R. 231 -239).

On July 7, 2006, the claimant complained to Dr. Hobbs of intense nausea and mild right

upper quadrant discomfort.  Claimant reported missing work because of her intense nausea.  On

July 11, 2006, claimant complained of abdominal pain.  Dr. Hobbs suspected that common bile

duct stones caused claimant's pain, but her MRI scan was normal.  On August 4, 2006, claimant

complained of an elevated blood pressure, and her BP readings were 128/88 sitting and 124/92

standing.  She also complained of edema; however, none was found on examination.  On October

27, 2006, claimant complained of headaches and Dr. Hobbs noted that they were probably

tension headaches.  Her blood pressure was 124/86, and her weight was 249 pounds.  On December 28, 2006, claimant complained of a head cold and having a lot of emotional issues with job stress and deaths.  Claimant's blood pressure was 136/86, and her weight was 254 pounds.  Dr. Hobbs reported that claimant's hypertension was possibly not adequately controlled with her current medicine.  (R. 219 -226).

On December 26, 2006, claimant had a follow-up visit with Dr. Mumford.  Claimant reported stress at work and a few weeks of worsening symptoms of anxiety and periodic depression.  Dr. Mumford noted that the claimant had poor ability to modulate her anxiety and scheduled claimant for anxiety management training.  On January 19, 2007, claimant reported to Dr. Mumford that she was generally feeling better, but complained of problems with insomnia.  Dr. Mumford suggested that claimant's insomnia might be related to her use of caffeine in an over-the-counter painkiller.  (R. 315-318).

On January 22, 2007, claimant complained of an inability to go to work because of her nausea and reported that she had a headache for a week.  Dr. Hobbs noted that claimant experienced hypertension with her headaches and that it was not currently controlled with her current medication.  On March 30, 2007, claimant reported doing a little better but still had lower back pain with range of motion.  Her blood pressure was 128/82 and her weight was 266 pounds. Dr. Hobbs noted that the claimant's hypertension was adequately controlled with her present regimen.  On April 17, 2007, claimant complained of nausea and vomiting enduring a week, with stabbing right upper quadrant pain. Claimant's weight was 265 pounds and Dr. Hobbs noted that the claimant had progressive weight gain.  Dr. Hobbs determined that stress provoked claimant's paroxysmal abdominal pain and nausea, and abdominal migraine, biliary dyskinesia and other

9

etiologies were possible but seemed improbable.  Dr. Hobbs reviewed his findings with Dr. Wilkerson.  Dr. Wilkerson recommended that the claimant go back to therapy and counseling. Dr. Hobbs recommended claimant resume Bentyl as needed, and Reglan.  (R.205 -217).

On April 20, 2007, claimant reported to Dr. Mumford that she had nausea and believed that work stress caused her symptoms.  She reported feeling well on the weekends, but becoming very nauseous and tense before having to go back to work.  Claimant requested work excuses. Dr. Mumford agreed to provide a work excuse for the previous three days, but said that she would not provide further excuses.  Dr. Mumford told the claimant that if she were unable to tolerate her work situation, she had the choice of looking for a new job, filing a formal grievance, and other solutions.  The doctor reduced claimant's Paxil prescription and indicated that she would eventually stop taking that drug.  She also increased the prescription of Effexor and Klonopin.  Dr. Mumford noted that the claimant should receive supportive assistance, with firm guidance.

On April 25, 2007, claimant was fired from her job and reported that her employer would not take Dr. Mumford's work excuses.  On May 3, 2007, claimant reported that she was feeling much better since she was fired from her job.  She claimed to no longer experience nausea, and she was relieved.  Dr. Mumford noted that claimant's mood was good, her anxiety was controlled, and she was sleeping well.  Claimant also reported that she was busy looking for a job. (R. 310- 312).

On June 1, 2007, claimant complained of nausea, but said she felt a lot better.  She reported that she was collecting unemployment compensation and Dr. Mumford encouraged her to remain active in looking for a new job. On July 6, 2007, claimant complained of feeling

poorly, stomach sickness, crying spells, insomnia, and napping during the day.  Claimant

reported that she did not want to go anywhere or do anything during the day, and often did not

change into day clothes.  Dr. Mumford advised the claimant that inactivity, napping, and failure

to look for another position were likely some of the most destructive things she could do. (R.308-

309).

On July 5, 2007, claimant visited a state agency medical consultant, Dr. Glenn

Carmichael.  Dr. Carmichael found that claimant had tenosynovitis (inflammation of the sheath

around the tendon) of her feet, and recurrent abdominal pain because of anxiety related to her job

situation.  Dr. Carmichael also noted that the claimant was obese and recommended a medium

level of functional limitations with safety precautions.  (R. 303).

On July 9, 2007, claimant visited another state agency medial consultant, Dr. Stuart

Stephenson.  Dr. Stephenson found that the claimant could be expected to perform medium level

work-related activities, lifting and carrying a maximum of 50 pounds occasionally and 25 pounds

frequently.  He further found that claimant could frequently climb ramps and stairs, balance,

stoop, kneel, crouch and crawl, and that she could never climb ladders, ropes or scaffolds.  Dr.

Stephenson also concluded that the claimant could not work around hazards such as machinery

or heights, but found no other environmental limitations.  (R. 329-336).

On July 11, 2007, claimant visited a state agency psychological consultant, Dr. Dale

Leonard, Ph.D.  Dr. Leonard found no evidence of a severe mental impairment, but found that

the claimant had symptoms of an affective disorder (depression that does not precisely fit within

depressive syndrome) and an anxiety related disorder (history of anxiety on 5/07 that does not

precisely fit within the anxiety categories listed).  As to "B" criteria, Dr. Leonard also found that

11

the claimant had mild limitations in activities of daily living, and moderate limitations in maintaining social functioning and concentration, persistence, or pace with no episodes of decompensation.   (R. 337-350).  He further concluded that the evidence did not establish the presence of "C" criteria.

On August 2, 2007, the claimant returned to Dr. Hames, the podiatrist, who noted bilateral limb pain and bilateral tenosynovitis. Dr. Hames counseled the claimant regarding the potential for addiction and habituation with narcotic pain medications.  (R. 395).

On August 29, 2007, claimant complained of respiratory symptoms with minimal fever to Dr. Hobbs.  Dr. Hobbs noted that claimant had nausea without weight loss despite several medication adjustment by Dr. Wilkerson.  A progress note from Dr. Wilkerson, dated August 30, 2007, indicated that the claimant complained of cramping pain, insomnia, and nausea.  Dr. Wilkerson encouraged her to remain focused on her capabilities rather than her symptoms. Claimant's prescription was changed from Effexor to Zoloft. (R. 384-385).

On September 24, 2007, claimant visited Dr. Hobbs, with abdominal pain and tenderness. Dr. Hobbs determined that her symptoms were probably caused by diverticulitis, and he wrote her a prescription for Septra and Flagyl.  On September 27, 2007, claimant reported that she was a lot better.  On December 12, 2007, claimant reported that Zoloft was helpful with her depression but that she continued to sense some depression, as well nausea and insomnia.  Dr. Hobbs's charts reflect that Dr. Wilkerson had increased claimant's Zoloft dosage.  (R. 380-383).

On December 31, 2007, claimant complained of bilateral temporal tension headaches, and an episode of fleeting left axillary chest pain.  Dr. Hobbs noted that claimant's hypertension was possibly not adequately controlled.

12

Claimant's EKG on January 30, 2008, was borderline, with short PR wave syndrome.  Dr. Hobbs prescribed Procardia XL.  On February 1, 2008, at a cardiological consultation by Dr. Ba'albaki, claimant's blood pressure was 117/88 standing; her weight was 268 pounds.  The claimant complained of chest pain, dyspnea, fatigue, lightheadedness, and nausea.  Dr. Ba'albaki determined that the claimant's chest and lungs were clear, and her EKG was within normal limits.  Dr. Ba'albaki advised her to lose weight and planned an Adenosine Cardioline scan and Echocardiogram.  (R. 370-374).

On February 8, 2008, claimant visited Dr. Wilkerson and complained of depression, anxiety with panic attacks, headaches, fatigue and nausea.  The doctor observed prominent somatization (a disorder where the patient complains of varied physical symptoms that have no identifiable origin), and Dr. Wilkerson encouraged claimant to be active, search for a job, and to sleep regular hours with no napping.  The doctor increased claimant's Zoloft dosage.  ( R. 369).

On March 10, 2008, claimant called Dr. Hobbs and requested another copy of a work excuse from April 23, 2007.  On April 28, 2008, claimant complained of diffuse persistent lower back pain and upper leg aching with standing and walking.  Claimant's weight was 274 pounds, and Dr. Hobbs characterized claimant as "very obese."  Lumbar spine x-rays were performed and interpreted as showing mild disk space narrowing at L5-S1.  Although she reported to Dr. Hobbs that Dr. Ba'albaki had wondered about fibromyalgia, she reported no soft tissue pain other than low backache and upper leg ache.  (R. 362-3368).  The lumbar spine x-ray showed possible degenerative disk at L5-S1, but was otherwise normal.  (R. 361).

On June 9, 2008, claimant visited Dr. Fields from Alabama Psychiatric Services and stated that her worries, anxiety and depression had somewhat improved and that her issue with

nausea continued.  On July 22, 2008 claimant returned to Dr. Fields and reported that her nausea was better, but her anxiety was worse. (R. 358-359).

On August 22, 2008, claimant reported blood in her stool to Dr. Hobbs.  Her weight was 276 pounds and her blood pressure was 118/82.  Dr. Hobbs noted morbid obesity and recommended weight loss with a prudent diet and exercise program.  Claimant's blood pressure was adequately controlled.

On August 27, 2008, Dr. Shergy, a rheumatologist at Rheumatology Associates of North Alabama, wrote a letter "To Whom It May Concern" stating that he was currently treating the claimant for "fibromyalgia, osteoarthritis, as well as degenerative joint disease in her hands, knees and feet.  She also has 70% loss of cartilage in her right knee." (R. 353).

On September 14, 2008, Dr. Hobbs noted that he had completed a medical leave form on June 15, 2006 for the claimant and he advised that she remain under psychiatric care.  (R. 355-357). On September 23, 2008, Dr. Fields increased the claimant's prescription for Zoloft and decreased her prescription for Nortriptyline, noting that the claimant had experienced no significant change in mood but had experienced increased anxiety and continued to report symptoms of depression.

On September 18, 2008, the claimant filled out an affidavit of work activity.  In that affidavit, she claimed to have become disabled from work on April 23, 2007, and stated that since that date, she has worked four-hour shifts in the school cafeteria on one or two days but could not continue.

### *ALJ Hearing*

After the Commissioner denied the claimant's request for SSI, the claimant filed a request

for reconsideration and received a hearing before an ALJ.  (R. 34).  At the hearing on October 7,
2008, the claimant's attorney advised the ALJ that the claimant's severe impairments were
depression, anxiety, nausea, vomiting in the mornings, and arthritic conditions in her feet, knees,
and hands.  (R. 38-39).

The claimant testified that she began to have problems with her feet in 1999 or 2000,
while she worked at "TJ's," but she continued to work.  She explained that when she stood on
concrete for any length of time, the pain in her feet would be unbearable by the time she left
work.  Claimant stated that she would get cortisone injections into her feet and take medicine to
bring the swelling down.  She also testified that she had worn a soft cast and shoe inserts in the
past.   The claimant related that she left TJ's for a better job at Clean Air.  She testified that she
began to have a lot of problems with her feet, hands, and knees because she was standing in one
position for a long time.  During 2004 and 2005, her feet and knees were swollen on a regular
basis and in 2005 and 2006, by the end of her workday, her pain was at an eight or a nine on a
ten-point-scale.  The claimant stated that she had 70 percent loss of cartilage in her knees. (R. 42-
45).

The claimant also explained that around 2004 or 2005, she began to experience almost
daily morning nausea caused by anxiety and depression.   She started to miss work around 2006
because she was in so much pain, sick to her stomach, and had a hard time getting up and
functioning in the mornings.  She testified that she missed at least three or four days of work each
month.  (R. 42-45).

The claimant further testified that she would have a migraine headache one to three times
a month.  The claimant testified that she was currently taking ten medications on a regular basis.

15

(R. 46-47).

The claimant testified that she had insomnia and was on Continuous Positive Airway Pressure (CPAP) machine (treats sleep apnea).  Claimant testified that she sleeps five to six hours on a good night, but on an average night she sleeps two to three hours.  (47-48).

The claimant testified that she is not able to do much of her own housecleaning or grocery shopping and she has trouble gripping items; however, her daughters help a lot.  As to recent work, she stated that she tried to work at a cafeteria, but after she finished a four-hour shift, the pain in her feet was unbearable.  (R. 48).

The claimant further stated that she was 5' 5" and weighed around 280 pounds. She uses an air glider at home to exercise.  The claimant testified that she drives only to church and to appointments.  (R. 49-50).

The vocational expert (VE), Thomas McCutcheon, testified concerning the type and availability of sedentary jobs a hypothetical person with similar ailments and characteristics as the claimant was able to perform.  He found that limiting her to a sedentary job would preclude her ability to perform physical demands associated with all her past relevant work.  He further stated that a person in claimant's position and with her ailments could perform unskilled sedentary work and he listed a weight tester, final assembler, and a rotor assembler, as examples of unskilled sedentary work, each of which exist regionally in numbers of approximately 800 or greater and in excess of 100,003 in the national economy.  (R. 56).

The ALJ posed the same hypothetical scenario to Mr. McCutcheon except that he changed the overall exertion level from sedentary to light and limited it to standing and walking for no more than two hours a day.  Mr. McCutcheon testified that the hypothetical would also

preclude claimant's past work.  An assembler of small parts, inspector of products, and a nut and bolt assembler are the examples Mr. McCutcheon listed of such light unskilled work such person could perform.  Mr. McCutcheon testified that the examples of jobs he listed exist in numbers of approximately 2,000 or greater regionally and in excess of 250,000 in the national economy. (R. 57).

Mr. McCutcheon testified that pain at a level of intensity that would adversely affect the ability to sustain concentration to tasks or persistence or pace of tasks for up to two hours at a time would preclude unskilled work.  Mr. McCutcheon also stated that a need for frequent work breaks outside the customary breaks provided by the employer would preclude the ability to sustain any gainful employment.  Finally, he testified that absenteeism of two or more days monthly occurring frequently month-after-month would preclude the ability to maintain any gainful employment.  (R. 56-58).

### The ALJ's Decision

On November 20, 2008, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act. (R. 8).  First, the ALJ found that the claimant met the disability insured status requirements of the Social Security Act on May 28, 1999, and continues to meet them through the date of his decision.  Next, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of her disability.  The ALJ also determined that the claimant's severe obesity, mild degenerative disk disease, fibromyalgia, generalized osteoarthitis, hypertension, anxiety and tenosynovitis of the feet do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4. (R.20).

In making this determination, the ALJ found Dr. Hames's opinion, stating that the

17

claimant has a need for disability secondary to chronic foot and back pain, did not provide function-by-function information about limitations to the extent that disability was clearly established.  The ALJ also noted that on July 6, 2007, rather than advising the claimant to seek disability, Dr. Mumford encouraged the claimant to seek other employment, because her prior work situation was too stressful.  (R. 17).

The ALJ assigned little weight to Dr. Carmichael's opinion because the state agency medical consultant had never treated or examined the claimant.  The ALJ assigned greater weight to the claimant's treating physicians, who have noted lower extremity arthritis and degenerative joint disease that are more consistent with sedentary work.  (R. 17).

The ALJ found that the claimant retains the ability to perform sedentary work-related activities. He noted that her activities of daily living that she listed in the questionnaire dated May 28, 2007 and that she acknowledged in her hearing testimony demonstrate that she has "the ability to sit, stand, walk, bend, reach use both hands and operate some hand and foot controls ... [;that] [s]he maintains a good level of social functioning and demonstrates responsibility and the ability to concentrate."  (R. 19).

He found her allegations of disability beginning April 23, 2007 not credible given evidence "that she received unemployment compensation in all four quarters of 2007 [but] Alabama law specifically precludes eligibility for such benefits where the claimant is unemployed due to sickness or disability."  (R. 19) (citing Ala. Code § 25-4-77 & 78).  He also found her "complaints of pain, stiffness and other symptoms not credible or consistent with the medical evidence to the extent that she [claims to have been] unable to perform the exertional and nonexertional requirements of sedentary work."  *Id*.

18

The ALJ also found that the claimant could not climb ladders, ropes or scaffolding, and that she is moderately limited in her ability to interact with coworkers and to respond appropriately to supervision.  The ALJ determined that the claimant is limited to unskilled work. The ALJ also found the claimant to have the residual functional capacity to engage in a significant range of sedentary work, limited by the above restrictions.  The ALJ determined that the claimant is unable to perform any past relevant work and has no transferable skills. (R. 21).

The ALJ also found that although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.21 as a framework for decision-making, significant numbers of jobs exist in the national economy that she can be expected to perform, taking into consideration her age, education and work history.  (R. 21).

*Post-Hearing Activity*

On January 23, 2009, the claimant requested a review of the hearing decision before the Appeals Council.  In addition to the documents that the ALJ considered, the claimant submitted the following evidence attached to a letter to the Appeals Council dated February 18, 2008.

<u>Records of Dr. Shergy dated May 29, 2008 through July 31, 2008</u>

On May 29, 2008, claimant visited Dr. Shergy, complaining of pain in her knees and legs, particularly when she tries to get up or walk.  Claimant also complained of aches and pains in her back, shoulders, arms, and legs, without red, hot, or swollen joints.  The exam determined that the claimant was in no acute distress and neurologically she was intact with good strength, sensation, and reflexes.  Dr. Shergy found claimant's joints show mild degenerative disease in the hands but good motion in the upper extremities, and no impingement at the shoulders.  Dr. Shergy also noted that claimant's hips had some mild decreased internal rotation and crepitus at

both knees but no synovitis.  Claimant's toes and ankles showed some chronic degenerative disease.  Dr. Shergy noted as well that patient gained 60 pounds since May of 2004.  He recommended weight loss and Flexeril (muscle relaxer) at bedtime.  (R. 401).

On July 31, 2008, claimant returned to Dr. Shergy and reported a small improvement but mild aching in her knees.  Dr. Shergy determined that the claimant's joints had stable degenerative disease in her hands, knees, and feet.  Claimant had a few tender areas but not marked problems and her lab work was unremarkable.  Dr. Shergy found that claimant had underlying fibromyalgia, osteoarthritis.  He encouraged claimant to do low impact exercises because she had lost 70% cartilage in her knees.  Dr. Shergy also noted that the claimant had been walking on a treadmill and he recommended that she try an elliptical machine and water therapy.  (R. 400).

Records of Alabama Psychiatric Services, including a Medical Source Statement (Mental)

Dr. Robbins referred the claimant to Dr. Jannus, a neurologist.  On September 26, 2008, Dr. Jannum reported that she had two to three headaches a week with nausea and occasional vomiting for two years.  Claimant also reported that she had taken Topamax for two months and her headaches were once a week.  Dr. Jannum found that the claimant had migraine headaches and increased her dosage of Topamax and gave her samples of triptans.  (R. 416-17).

Additional Records of William Hobbs

Dr. Hobbs's records on the claimant included a chart of current medications dated from April 2007 thorough August of 2008.

On October 4, 2008, Dr. Hobbs reported that the claimant did not disclose to his office that she had been treated with Topamax, Triptans, Fiorinal and Stadol NS by Dr. Robbins.  Dr.

Hobbs also noted that the claimant did not mention headaches in her last visit and had either stopped Inderal or failed to disclose the medication to Dr. Jannun. (R. 415-417). He stated: "She has a VERY complex psychiatric state as well with apparent psychogenic nausea and vomiting and seemingly unrelated tension type headaches for which I gave her 20 fioricet in February." (R. 415).

On October 27, 2008, claimant returned to Dr. Hobbs and complained of acute respiratory symptoms.  Dr. Hobbs found that claimant had an upper respiratory infection and prescribed Mucinex DM and Flonase. (R. 414).

Appeals Council Denial of Review

On June 23, 2010, the Appeals Council denied the request for review.  In its denial letter, it stated that it had considered the additional records of Dr. Hobbs through October 27, 2008 (added to the Record as Exhibit 15F); Dr. Shergy (added to the Record as Exhibit 16F); and Alabama Psychiatric Services through September 23, 2008 (added to the Record as Exhibit 17F). The Council found, however, that "this information does not provide a basis for changing the [ALJ's] decision."  It also stated that the Council "looked at additional evidence from Alabama Psychiatric Services PC, dated December 29, 2008" and that this new information relates to a period after the ALJ's decision on November 20, 2008.

The Record before this court does not include the additional evidence from Alabama Psychiatric Services dated December 29, 2008, and does not indicate whether the Appeals Council returned that evidence to the claimant.

### VI. Discussion

The sole argument that claimant raises on appeal is whether the Appeals Council failed to properly review additional medical evidence submitted to the Council subsequent to the hearing decision, and thus, whether its decision to deny review of the ALJ's decision despite the additional submissions represents error.

The Appeals Council will review a case if the claimant submits new and material evidence.  20 C.F.R. § 404.790(b).  "New" evidence is evidence that is non-cumulative and "material" evidence is evidence that is "relevant and probative so that there is a reasonable possibility that it would change the administrative result." *Milano v. Bowen*, 809 F. 2d 763, 766 (11th Cir. 1987).  Accordingly, this court must determine whether the evidence properly submitted to the Appeals Council was new and material.  Thus, when a plaintiff submits additional evidence to the Appeals Council and argues to the court that the Appeals Council erred in denying review, a district court must determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, including the newly submitted evidence.  *Ingram v. Comm'r of Soc. Security*, 496 F.3d 1253, 1262 & 1266 (11th Cir. 2007).

In the instant case, the Appeals Council stated that "[i]n looking at your case, we considered the additional evidence listed on the enclosed Order of Appeals Council.  We found that this information does not provide a basis for changing the Administrative Law Judge's decision." (R. 1).  The Commissioner points out that all of the documents *listed on the Order of the Appeals Council* from Alabama Psychiatric Services as Exhibit 17F were additional copies of

22

documents that were part of the Record before the ALJ, and thus, were duplicative. The court agrees that these documents were not "new"and do not support review by the Appeals Council.

The additional medical charts from Dr. Shergy submitted to the Appeals Council and listed as Exhibit 15F in the current Record were *not* part of the Record before the ALJ. Specifically, those medical charts are on pages 400-408 of the current Record and contain information from two service dates of 5/29/08 and 7/31/08, and two test dates of 5/29/08 and 6/5/08. Even though these documents were not part of the Record before the ALJ, Dr. Shergy summarized the information in those charts in a letter dated August 27, 2008, which *was* included in the Record before the ALJ as Exhibit 12, and was evaluated by the ALJ. In light of Dr. Shergy's letter, the court agrees that the information contained in Exhibit 15-F is not material and does not support review by the Appeals Council.

The final set of documents listed as received additional evidence and part of the Record as Exhibit 16F is a set of charts from Dr. Hobbs. Other than a list of medications, this set of charts contains Dr. Hobbs's progress notes from two service dates – October 4, 2008 and October 27, 2008 – and a consultation report from Dr. Jannun dated September 26, 2008. In that September 26 evaluation, Dr. Jannum did record the claimant's complaints of severe migraine headaches occurring during the two previous years as "much worse in the past few months. She was having 2-3 headaches a week with nausea and occasional vomiting." (R. 416). Dr. Jannun also recorded claimant's statement that Dr. Robbins had prescribed Topamax, Stadol, Fiorinal, and Zoloft.

The court notes that this set of documents focuses heavily on claimant's migraine headaches and also refers to respiratory problems.  When she filed her claim and at the October 7, 2008 hearing, the claimant did not allege that she was disabled because of migraines or respiratory problems, or that those specific problems combined with others to significantly limit her ability to function.  Further, at the hearing, the ALJ asked claimant's attorney to identify the severe impairments that precluded her from working, and he responded with the following: arthritis in feet, knees, and hands with associated pain; depression; nausea, and anxiety.  He did not list headaches or respiratory problems.   Therefore, the ALJ and the Appeals Court had no duty to consider the claimant's migraine diagnosis or respiratory infection.  *See Pena v. Charter*, 76 F. 3d, 906, 909 (8th Cir. 1996) (stating that ALJ had no "obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability"); *see also Robinson v. Astrue*, 365 F. A'ppx. 993, 995-96 (11th Cir. 2010) (citing *Pena* with approval and holding that the ALJ had no duty to consider an impairment that the plaintiff neither listed in her application for disability benefits nor asserted at the hearing as a basis for disability).

As reflected above, Dr. Hobbs's October 2008 progress notes did mention claimant's problems with *nausea*, a condition she listed in her application and upon which she focused at the hearing.  However, he did not provide any new information about that particular condition, except to the extent that he characterizes it as having an "apparent psychogenic" origin, referring to her "complex psychiatric state."  (R. 415).  Although Dr. Hobbs is not a mental health professional, his statement reflects his inability to establish a physical cause for her nausea.

Dr. Hobbs's progress notes of October 4, 2008 do provide new information to assist in assessing the claimant's *credibility*.   For example, those records indicate that claimant complained to Dr. Jannum that her headaches were severe, but Dr. Hobbs explicitly notes that "claimant did not mention headaches last visit [to his office] and has either stopped Inderal [a prescription medication used to treat migraines] or failed to disclose this to Dr. Jannum."  (R. 415).   The last progress note from October 27, 2008 records "acute respiratory symptoms" but no headaches. (R. 414).   Indeed, other statements in the October 4 progress note raise questions about the claimant's general veracity.   Dr. Hobbs reported that the claimant did not disclose to him that Dr. Robbins had prescribed Topamax, Triptans, Fiorinal and Stadol NS.

The court finds that although some of the information contained in Exhibit 16F is "new" and non-cumulative, it is not material, because it would not change the administrative result. Indeed, it could well lend further support to the ALJ's decision that the claimant's condition is not as severe and disabling as she asserts.  In any event,  it does not support a different result; even with the addition of this new evidence, substantial evidence in the Record as a whole, including that new evidence, supports the ALJ's decision.  *See Ingram*, 496 F.3d at 1262 & 1266.

In addition to the submissions listed in the Order of Appeals Council and discussed above, the Notice of the Appeals Council states that the Council also looked at one other record from Alabama Psychiatric Services PC dated December 29, 2008.  Noting that the ALJ decided the claimant's case through November 20, 2008 and that the record in question was dated more than a month *after* the decision, the Appeals Council found that the record would not support review: "This new information is about a later time.  Therefore, it does not affect the decision

25

about whether you were disabled beginning on or before November 20, 2008." (R. 1).  The court notes that twice in her brief, claimant misquotes this passage, omitting the "not" in the last sentence.  (Cl.'s Br., doc. 8, at 7 & 9).

In the appeal before this court, the claimant does not argue that the December 29 document, which is *no*t listed in the Order of the Appeals Council and is *not* part of the current Record,  provides new, material evidence that would support a different result.  She does not *submit* that document for first time inclusion in the Record and request that the case be remanded pursuant to sentence six of section 405(g).  Rather, she simply argues that because the current Record does not contain a December 29, 2008 document, the Appeals Council must have misstated the date, and the misstatement reflects "a failure on their part to adequately review the additional evidence submitted." (Cl.'s Brief, doc. 8, at 3).

This court disagrees.  The Appeals Council was careful to distinguish between the December 29, 2008 document and the other documents submitted to the Appeals Council that were listed on the Order of the Appeals Council and would become part of the Record as Exhibits 15F-17F.  The Appeals Council explained that it included Exhibits 15-F-17F in the Record because they related to claimant's treatment before November 20, 2008, whereas the December 29, 2008 record did not relate to the relevant period and was not listed as an exhibit.  Contrary to the claimant's argument, the fact that no December 29, 2008 document is included in the Record is entirely consistent with the Appeal's Council decision and with its specific finding that the document was irrelevant. In light of that explanation, the omission of the December 29,

2008 document from the Record does not indicate that the Council misstated the dated of the document or failed to review the submissions.

As noted previously, claimant has not submitted to this court the December 29, 2008 document. Thus, even if the document, dated *after* the hearing decision, did somehow relate to the relevant period and was indeed material to ALJ's decision, the court has no way of so determining.

In sum, this court finds that substantial evidence *in the Record as a whole*, including the material new evidence, supports the Commissioner's decision, and that the Appeal's Council decision denying review did not represent error.

## V. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED.  The court will enter a separate order to that affect simultaneously.

Dated this 29th day of September, 2011.


KARON OWEN BOWDRE

UNITED STATES DISTRICT JUDGE